Good morning, Your Honor. Good morning. Good morning, sir. My name is Mark Greenberg. I'm the counsel for the appellant, Sansom Adeyemi. With the court's permission, I'd like to reserve three minutes of rebuttal argument. Granted. Were you the trial counsel? I was. I just want to just factually get straight in my head what happened here with regard to this gun charge instruction. I know you put in a charge, and it wasn't accepted in full. And then when the judge read the instruction, was there any objection afterwards? There was no objection afterwards. Okay. The reason why there was no objection afterwards was because the issue was preserved, both at the charge conference and in connection with the actual filing of the instruction. But I thought the judge said he would say is designed, and he said was designed. Correct. And then he threw in that thing about... Operability. Well, I've also thought he threw in some language about the government doesn't have to prove it's a real weapon. He said that too. Okay. And you made no objection to those statements? Well, the fact of the matter is it is, as a matter of law, a gun does not have to be operable to be a firearm. That is a fact. I know, but that's not what I said. I said he... I wanted to know whether after he said was designed instead of is designed, and after he said the government doesn't have to prove it's a, quote, real weapon, you didn't say anything? I did not say anything. Okay. And does that constitute a waiver? I would submit not because of the fact that it was preserved in the first instance with the filing of the instruction and also discussion at charge conference about the word was versus is. Well, let me just ask you about that. We agree there were no objections at the conclusion of the charge, but at the charge conference when you discussed this on the record, your particular complaint initially was about paragraph three of your request to charge, right? That's correct. And the judge told you that it's implicit in what he's going to give. He's just not going to use that, your particularized language, correct? He said that. And you seemed totally satisfied with that. And you said then the problem I have, Judge, is with the government's second paragraph in its instruction, which is the was and the is, correct? Yes. You're right. And then when he charged the jury, as I read the charge, you said he was going to make that change. And when he charged the jury, I'm looking at Appendix 605, he charged is, as you requested. Well, he charged is in the first paragraph of his charge. And then when he sort of summarized the charge toward the end, and that would be found on page 606 of the appendix, where he writes at line three, or says, the government is required at a minimum to establish that the gun was designed to fire projectiles or that it could be readily converted to fire. So he left out one is, and that's your argument before us? Well, it goes a little bit beyond that. I don't understand what real difference is makes over was. I'll tell you what the difference is. The difference is that when a gun is manufactured, and it's manufactured as a firearm, simply because it was manufactured, was manufactured as a firearm back in 2000, doesn't mean it is a firearm in 2006 when the robbery takes place. I think you better see where I'm at. And that's the distinction. So I understand that there's one word in one's past tense and one's present tense, but the way the statute is written. But the charge, the firearm charge as a whole makes it quite clear what the definition of firearm is. And if indeed he should have put is, was, or is at line four of, at 606, why didn't you object if it was that important? He made that error, if error is thing. Well, I think the answer is. He could have corrected it. By virtue of the fact that, and I go back again to the initial observation I make, is that the existence of the charge itself, the request for particular language in the instruction, as far as I was concerned, preserved the issue. But we even have to go beyond that. Well, we have to go beyond that one word situation. This gun was in such disrepair that the jury had a right to be instructed on how it should view that disrepair in the connection with whether or not it is a firearm at the time of employment. Now, I'm a little confused about this gun statute. I'm not sure about how crucial this can be to the statute. It doesn't have to be operable. It covers, what, the frame, the receiver. If you just use a frame or receiver, then it's a gun? Well, no. I thought that's what the statute says. And that's what I don't get. Doesn't the statute say if you commit the crime with a silencer, if you commit the crime with a frame or receiver, I think it's phrased in the OR. So I don't know what that means. Can you explain it to me? Well, I think the court in WADA, the case that I cited in the brief, addresses that issue. And the issue is that the frame or receiver does not independently qualify as a firearm. It basically is joined together with the object itself. So if, in fact, you have a frame of a receiver of a gun that is not a firearm because it is not designed to expel a projectile by an explosive, or is not readily convertible to expel a projectile by an explosive, then the frame or receiver, independent of that, does not qualify as a firearm under 921A3B. But you gave him, the judge, the statutory language in the first paragraph of your request to charge, which includes the frame or receiver language. And if that isn't clear, I suppose it's for Congress to clear it up, wouldn't it be? Well, I mean, the point is, again... We're not talking here about a frame or receiver. No, we're talking about something that was a gun that is a firearm at the moment of employment. And I think under the... You had the expert testimony that was quite clear in this regard, Officer Stott. Yes. And his testimony was relevant on the issue of whether or not this particular gun could be readily converted to expel a projectile by an explosive. Well, I agree with that, but that doesn't... Well, what's our standard of review? Abusive discretion. For the jury find? Well, no, I'm talking about abusive discretion in connection with the request for the charge. I'm not challenging the sufficiency of the evidence here. That's not what I'm... I am not challenging that. All I'm challenging is that when the district court tells the jury, that the government doesn't have to prove that the gun is operable to be a firearm. And when you have issues of fact concerning the disrepair of the gun, that go to the degree that the gun is falling apart in pieces and needs to be held together by a hairband. And that you have missing pieces of the gun and other pieces that are bent. The government doesn't have to prove operability. I would submit to the court that it abuses its discretion and not going the extra step in defining how the jury should view the degree of inoperability. He didn't say that. He said readily converted to fire. He gave the... essentially he tracked the statute. Correct. Well, but Your Honor... And you didn't object? Well, if I didn't object... So isn't this plain error review on the charge issue? Well, I don't think it's plain error review. The government never challenged it in its response to this particular brief. I know that. So we're looking... You're saying that as a whole, this firearm charge that he actually gave, not the ones that were requested and agreed to, but the ones he actually gave, led the jury astray? It did. It led the jury astray and did not put in front of the jury all the facts that it should have considered. You know, every case is unique, and jury instructions have to be tailored to each and every case. I don't think you can necessarily give a stock jury instruction if, in fact, there are facts in a case that call for jury instruction. Call for, not necessarily modification, but addition to the particular jury instruction. Help me. Your argument seems to assume that if a gun, which was obviously designed to expel a projectile, if you take a part of it, one part from it, it's no longer designed to be used as a weapon. If it's designed to expel a projectile, or if it's held together, it's got all of its parts, but it's held together by some kind of band, that it ceases to be designed as a gun. I mean, this statute was designed to, when it says a gun doesn't have to be operable, all it has to do is be designed to be a gun, it's recognition of the fact that if you've got a gun, even if it's an operable gun, it's designed to be a gun. If it's not operable, and you use it in a robbery, you're likely to get somebody hurt one way or another, right? Well, I don't necessarily agree with that, because if that was the case, a statute would be written in terms of a firearm is anything that was designed to be a firearm. And then going forever forward, once it was originally manufactured, the way the statute reads, Your Honor, is that it has to be a firearm. It has to be a firearm at the moment of employment, not at the moment of manufacture. At the moment of employment, it has to be designed to... To be a firearm at the moment of employment, not the moment of manufacture. Now, to be sure, when a gun is manufactured and is a firearm, that's relevant on the issue of whether or not it's a firearm. But where you have, as here, a situation where the disrepair is so gross, then that raises an issue for the jury as to a matter of fact. Which then calls for the district court to explain to the jury how should it view that disrepair in the context of whether or not this particular gun is a firearm. It's an unusual use of the word design, though. If I have a gun here, and I take one of the parts away, did I redesign that gun? Well, no, but the question then becomes is, is it readily convertible to becoming a firearm? The judge gave you the readily convertible language, so in closing, you could have... I take it that you took advantage of the opportunity and detailed all the things that were wrong with this gun and made your argument that it wasn't, quote, readily convertible. But that doesn't explain... Well, I'm just saying, what he said, he gave you readily convertible. Well, that's part of the statute. He has to give that, because that is in the statute. But what would you now have had him say? Because he really gave your request of charge in inhade verba and the rest of it in substance. I don't think so. What would you have had him say to explain to the jury this concept that we're struggling with here of design and inoperability? Where's the language that... What would you have had him say? Your Honor, I invite you to page 15 of the brief, and it reads third paragraph. He wanted him to give the what a case language. The what a case language. That's correct, Your Honor. The nature and extent of a weapon's inoperability may be relevant in determining whether it will or is designed to or may readily be converted to expel a projectile by the action of an explosive. If the weapon in its current condition is not designed to or cannot be readily converted to expel a projectile, by the action of an explosive, it is not a firearm. That's this case. But isn't that what he said? No. No, I don't think he said that at all. The statutory... And then finally, and here's the rub. Simply because a weapon was a firearm when originally manufactured does not necessarily mean that it is a firearm in its present condition. That's right, and that's implicit in his charge. I think it could be argued. I think that's what the government does argue. We've taken all your time on the firearm. Perhaps you want to spend five. We'll give you five more minutes on the clock if you want to argue the suppression motion. With respect to the suppression motion, this young man goes down with dad to the police station to pick up his car. He goes down at 1130 at night. The police come out after interrogating Brian Winder, and then they lock him up, effectively.     Put him in a cell. Put him in a cell. Put him in a cell. Put him incommunicado in a room. They then leave for a period of four hours, while they then take two of the accomplices back up to the prison. And they leave this kid in the room for four hours, and then begin questioning him within four and a half hours. So under the circumstances of this case, I would submit to the court that the oral Miranda warnings that the detective testified that he gave, don't in any way render this otherwise involuntary, coercive environment voluntary. Or a statement by Mr. Adeyemi as the product of his free will. The judge took into consideration those facts. And also the fact that this wasn't a 16-year-old. This was a 19-year-old college student, right? This was a 19-year-old college student who was studying to be a doctor, and he had a gun. And yes, he was... So it's not, I mean... He's an adult. Nearly an adult. Well, right, he's an adult to serve the United States in the military, but he's not an adult to have a beer. But the point of the matter is that we're talking about a neophyte in the criminal justice system. And I think that someone who's had experience in the totality of the circumstances, that has to be taken into account in determining whether or not this statement ultimately was voluntary. But that is one of the circumstances within the totality. That is one of the circumstances that is right. I mean, this case is not dispositive on the fact that he's 19 years old and is a medical student. This case is... The major factor here is when he is... Really, there's no testimony of any explanation as to why he's removed from his... Oh, yes, there is, I believe. There is no testimony as to why he's removed from his father? Correct. Well, because they had the co-defendant testifying that he was implicated, that Mr. Adeyemi drove the car and was involved. I misspoke there. What I meant to convey was there was no testimony regarding Crone's statement to Adeyemi that we are going to put you in jail. We are going to put you in this room, separate you from your father, because you are under arrest for the robbery of the McDonald's and the Taco Bell. So that's what I meant. The first one in the room. That's correct. That's what I meant to convey, not the fact that there was... Because there certainly was testimony that Crone was interviewing Winder and the other individual before Adeyemi came there. So under the totality of circumstances, Your Honor, these oral warnings did nothing to change the facts. They did nothing to vitiate the involuntary taint of the actions of the police. And then when they... We call him a liar, and I stand corrected on the record. I think counsel is correct in saying that the officer did not raise his voice. He changed his voice. So under these circumstances, those written warnings did not in any way come back and change it and make it a voluntary statement. Thank you. Ms. Fiske? May it please the Court, Arlene Fiske on behalf of the government. Before you get into the details of the charge, can you explain to me how this came about, that he has a 32-year sentence? Certainly, Your Honor. And the other people who were engaged in two extra robberies have a seven-year sentence? Certainly, Your Honor. How did he come to be charged with a count that has a mandatory minimum of 30 years? If Your Honor would permit me to go outside the record, this 924C is a very powerful tool that Congress has given law enforcement to fight gun crime, gun violence in the cities. When there are circumstances of serial gunpoint robberies of commercial establishments, and those matters are looked at for federal prosecution, we often do, as we did in this case, look at the least liable, or the most liable, account. We look at the least culpable accomplices, in terms of those who would most be deserving of an opportunity to cooperate and avoid the mandatory sentences. In this case, because Mr. Adeyemi only participated in two robberies, and at the time we approached him with a complaint and warrant, frankly, we knew that his co-defendants had participated in many more. Mr. Adeyemi was arrested on a complaint and warrant in the federal government, and immediately approached by the prosecutors, and was charged with a count of 30 years. And given an opportunity to cooperate in exchange for both a 5K and 3553 motion, in exchange for cooperation against all of his co-conspirators and accomplices. He declined to do that. It was only after he declined to do that, that the government then approached Conway, Winder, and Hobdy, and offered them the opportunity to plead guilty to the multiple offenses that they committed in exchange for their cooperation. They did so, and when they did so, they identified a fifth accomplice, a Basile Davis, who also participated in these robberies, about whom we did not previously know. Thereafter, we went back to Mr. Adeyemi, even after he was indicted. In fact, we had Mr. Adeyemi, his previous counsel, and his father come to the government's office, and we again laid out to him the nature of the case against him. Not only at that time did we have his admission, but we also had three cooperating co-defendants, and again offered him the opportunity to cooperate against the fifth defendant, who was at that point not yet arrested by the Philadelphia District Attorney's Office. Mr. Adeyemi again declined. Your Honor, even when the jury in this case was deliberating, immediately before they returned their verdict, we again approached Mr. Adeyemi's counsel. We gave him the opportunity to cooperate in this case, so that the very harsh penalties of 924C could be avoided. He, at that time, declined. So that is how this matter came to this Court. The government, at every opportunity, and counsel, correct me, I don't recall whether or not at time of sentencing the offer was made, though it may well have been, because Basile Davis, at that time, though arrested by the Philadelphia District Attorney's Office, had not yet been convicted. Since that time, Basile Davis also pled guilty in the Philadelphia Court of Common Pleas to six counts of gunpoint robbery, as a result of the cooperation of Conway, Winder, and Hobdy. Mr. Hobdy has received a sentence in this matter. He received a 5K-3553 motion. He was sentenced to 120 months by Judge Davis. Mr. Conway and Winder have not yet been sentenced, because in addition to this matter, they are providing cooperation in a second, unrelated matter. And we're waiting for that cooperation to end, before they can be properly sentenced by Judge Davis. So I hope that explains, or answers, Your Honor's question as to how this matter came to the Court. Okay. Now, you want to get into the arguments about the charge? Certainly, Your Honor. With regard to the firearm, I believe, Your Honor, Judge Barry, you are correct, and that this is probably more likely a plain error argument, rather than a false one. In preparing for today's argument before you, and in reviewing the transcript, I believe, Judge Barry, you are correct, that there really has been no preservation of the gun charge, jury charge, before this Court. Mr. Greenberg did propose a particular charge to Judge Davis. At the charging conference, the district court judge specifically said, and this is at page 578 of the appendix, that he would say, which will, or is designed, or may be converted to expel a projectile. Is that what you want? Mr. Greenberg said, yes. The Court said, well, that's in my charge. I just read. And in fact, that precise language was indeed in Judge Davis's charge, and following that charge, there was no objection by counsel. Even if, however, we do look at the abuse of discretion standard, I would submit, Your Honor, that the charge given by the district court was absolutely proper, and in conformance with the law that has been adopted and accepted both by this Court as well as the Supreme Court. How about this phrase that he summarized, that he threw in at the end? The government doesn't have to prove it's a real gun. That is not in the charge, Your Honor. And I believe the Court is misreading. Yeah, it is, but it doesn't make much sense. At least I saw it, too. I don't think Mr. Greenberg's taken exception to it, but even if he did. Oh, my apologies. As I see, Your Honor, it's in the paragraph after the completion of the charge. I'm just wondering what that is all about there. So, the gun. The government does not have to prove that the gun is real. I believe that the Court is referring, and by context, when you look at the rest of that paragraph, to cases where, in fact, 924C charges can be prosecuted, where witnesses simply say, I saw the gun. The government does not produce the gun. And if the jury finds that it indeed meets the statutory definition, there can be... It's a confusing sentence. I agree, Your Honor. That is confusing. I believe, however, that we are obligated to read the jury charge as a whole, as Her Honor Judge Bowery has pointed out, and that the jury is expected to understand the jury charge in its entire context. And that in the full context that the Court has presented, and frankly, Your Honors, there is no question about whether or not the gun used in this instance was a real gun. It clearly was a real gun. Officer Stott identified it by make and manufacture. He testified that it is fairly easy to repair. The parts can be purchased through a gun store and without any tools at all be placed back into the gun, and one part that is inverted turned back, and the gun would be fully operable. The gun meets the definition as the Court's charge describes, and the Court's charge meets the statutory definition of the offense and of the firearm. The request made by defense to have the Court charge that the nature and extent of a weapon's inoperability may be relevant in determining whether it will or is designed, that's argument, and it is not up to the District Court to present the defendant's argument to the jury. It is up to defense counsel. The two other sentences of that last paragraph proposed by defense counsel are indeed in the charge, not in that precise language. Perhaps it's in the affirmative rather than the negative, but both of those two following sentences in the defense charge are included in the charge the Court gave to the jury in this case, and there was nothing improper about that charge, and in fact, as Her Honor Judge Barry has noted, was not objected to or complained about by defense counsel after it was presented to the jury. The court had no questions about the charge and were able to return the proper verdict based on the evidence that they heard. Unless this Court has any further questions about the gun, I'll move to the motion to suppress issue. Then I'll move to the motion to suppress issue. In this case, the defendant arrived at the police station at 1130 at night. At that point, Detective Crone, who had already read warnings to Ryan Hobdy, who had opted not to waive those warnings and had discontinued speaking to him, and then had read warnings to Brian Winder, who had waived his warnings, and then given what ultimately turned out to be a not entirely truthful statement, but nevertheless gave a statement exculpating himself, but inculpating Sansom Adeyemi. Detectives also knew that Sansom Adeyemi's car had been used at the McDonald's or had been going through the drive-thru of the McDonald's when the robbery occurred, and they also knew that Sansom Adeyemi lived directly behind Brian Winder and Brian Winder's brother, and for that reason they were suspicious that all of these robberies were related to each other, so that when Sansom Adeyemi arrived at the police station and the police officers saw him, they placed him in a room. There is no question about it. He was under arrest at that point. He was not free to leave, and he was placed in a room until the detectives had the opportunity to interview him fully. When the detectives did then return to the room where Mr. Adeyemi was and brought him into their investigative division, they told him why he was there, they told him what offenses they were questioning him about, and they read him his Miranda warnings. They explained the nature of the warnings. They asked a series of questions to make sure he understood those warnings. He answered all of those questions in a manner indicating his understanding of those warnings and his intention to waive them. They then had a conversation with the defendant. They explained to the defendant, or laid out to him, actually, the evidence that they had compiled at that point, the timeline, the video of his car, the information they had received from Brian Winder, and within 20 minutes, the defendant admitted to the detectives that indeed he had committed these offenses. In order to preserve that statement more fully, the defendant was then again given his Miranda warnings, but this time his answers to those warnings were written down as further proof of his waiver of those warnings, and his formal statement was taken. The district judge who heard that testimony had absolutely no issues with the veracity of the detective or of the ability of the defendant, based on that evidence, to knowingly and intelligently waive his warnings, based on the totality of the circumstances. And therefore, that statement was properly admitted to trial. Unless this Court has any further questions of me, though I do have extra time, I will sit down. I'm content. I am. Thank you. Thank you, Your Honors. Well, Your Honor, if you're content, then I can sit down as well. But I will agree with the counsel when she says that that particular statement by the District Court regarding the gun does not have to prove that the gun is real. Let me say that again. So the gun, the government, does not have to prove that the gun is real. I think that has to be placed in the context of the fact that... Why are you arguing that? I'm not. I'm just agreeing with counsel on that. I agree with her. So... I should have sat down before, so I'll sit down now. Thank you. Well, thank you, counsel. The case was very well argued, and we will take it under...